# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CALESA ASSOCIATES, L.P.; CALESA FAMILY TRUST, JULY 6, 2000; FRED APPLEGATE; JAY BERNSTEIN; GRAEME W. BUSH; CRAWFORD FAMILY TRUST, SEPTEMBER 8, 2000; PETER C. FARRELL; FRANK NORMAN FJELDHEIM II; STEVEN R. HOWARD; LEONARD GLINER; ANDREW HARRISON; ROBERT S. KRIM; JOEL LIFFMANN; THOMAS LLOYD;  JAMES P. MCGUCKIN; RLR GROUP, LLC; RICHARD RUBIN; STEVEN RUBIN; RUBIN FAMILY FUND, LLC; CHARLES ANDREW RUSSELL; JACK SCHNEIDER; SHERMAN-CALESA FAMILY TRUST, FEBRUARY 10, 1998; and JASON WILD, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 10557-VCG ) |
| AMERICAN CAPITAL, LTD.; AMERICAN CAPITAL EQUITY I, LLC; AMERICAN CAPITAL EQUITY II, LP; JEFFREY M. COHEN; NEIL M. HAHL; MICHAEL JANISH; JOHN L. LEWIS IV; and GORDON O'BRIEN, | ) ) ) ) ) ) ) |
| Defendants. | |

## MEMORANDUM OPINION

Date Submitted:  November 13, 2015
Date Decided:  February 29, 2016

Thaddeus J. Weaver, of DILWORTH PAXSON LLP, Wilmington, Delaware; OF COUNSEL: Joseph H. Jacovini and Thomas S. Biemer, of DILWORTH PAXSON LLP, Philadelphia, Pennsylvania, *Attorneys for Plaintiffs*.

Gregory V. Varallo, Robert J. Stearn, Jr., and Richard P. Rollo, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: John C. Massaro and Dana Y. Elliott, of ARNOLD & PORTER LLP, Washington, District of Columbia, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

The Plaintiffs, a group of minority stockholders of Halt Medical, Inc. ("Halt" or the "Company"), filed this action against certain current and former directors of Halt and its alleged controller, stockholder American Capital, Ltd. ("American Capital") and its affiliates, in connection with a transaction (the "Transaction") that the Plaintiffs denominate a "squeeze-out merger," but which was in fact an issuance of equity that diluted the interest in the Company held by the Plaintiffs, who remain stockholders. The Complaint alleges breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, and violations of Sections 242(b)(1) and 228 of the Delaware General Corporation Law ("DGCL"). The fiduciary duty claims are derivative in nature, but the Plaintiffs have eschewed the opportunity to so pursue them; instead, they seek to proceed only directly, under the rubric, concisely stated by this Court in *Carsanaro v. Bloodhound Technologies, Inc.*,[1] that a breach of loyalty resulting in dilution in favor of an insider represents an extraction of value from the unaffiliated stockholders, a claim which may be advanced directly. The Plaintiffs seek money damages and a judgment rescinding the Transaction. The Defendants, in turn, move to dismiss the Complaint on the grounds of acquiescence, estoppel, and laches, or alternatively, for failure to state a claim. For the following reasons, that motion is, with one narrow exception, denied.

---

[1] 65 A.3d 618 (Del. Ch. 2013).

# I. BACKGROUND FACTS[2]

## A. *The Parties*

Non-party Halt is a Delaware corporation, founded in 2004 by Edward F. Calesa for the purpose of supporting and marketing a procedure to treat fibroid tumors in women.[3] Calesa is a former Halt director and served as Chairman of the Halt board of directors (the "Board") at the time of the Transaction.[4] Halt's intellectual property includes valuable patents and trademarks related to the Acessa™ System, an FDA-approved procedure and technology for the treatment of fibroid tumors in women, which is said to substantially reduce the pain, trauma, and potential cancer risk associated with the once-traditional use of power morcellators.[5] As such, the Acessa™ System is well-positioned to become the standard of care for women in the treatment of fibroid tumors, according to the Complaint.

---

[2] The facts, drawn from the Plaintiffs' Verified Complaint (the "Complaint") and from documents incorporated by reference therein, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss. The parties dispute whether I may consider the documents related to the Transaction (the "Transaction Documents"), attached as Exhibit 1 to the Plaintiffs' Complaint, in evaluating the Defendants' Motion to Dismiss. Generally, the Court "may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents." *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) (citation omitted). Here, because the Complaint cites to and relies upon the Transaction Documents as the basis for many alleged facts—for instance, facts regarding the independence of Messrs. Hahl, Janish, and O'Brien—I find that it is appropriate to consider them in my analysis. The parties also dispute whether the Court may take judicial notice of the Halt Capitalization Table. *See* Defs' Reply Br. 32. I do not address this argument, however, as the Capitalization Table is not pertinent to my analysis.

[3] Compl. ¶¶ 52–53.

[4] *Id.* at ¶¶ 52, 68.

[5] *Id.* at ¶ 3. To morcellate is to physically reduce a body to small bits convenient to extraction.

Plaintiffs Calesa Associates, L.P. and Calesa Family Trust, July 6, 2000 (collectively, the "Calesa Entities") are stockholders and minority investors in Halt.[6] Calesa serves as General Partner and Trustee, respectively, to these entities.[7] Plaintiffs Fred Applegate; Jay Bernstein; Graeme W. Bush; Crawford Family Trust, September 8, 2000; Peter C. Farrell; Frank Norman Fjeldheim II; Leonard Gliner; Andrew Harrison; Steven R. Howard; Robert S. Krim; Joel Liffmann; Thomas Lloyd; James P. McGuckin; RLR Group, LLC; Richard Rubin; Steven Rubin; Rubin Family Fund, LLC; Charles Andrew Russell; Jack Schneider; Sherman-Calesa Family Trust, February 10, 1998; and Jason Wild are stockholders and minority investors in Halt.[8] Many of the Plaintiffs also hold debt, options, or warrants as part of their investments in the Company.[9]

Defendant American Capital, Ltd. ("American Capital"), a Delaware corporation with its principal place of business in Bethesda, Maryland, is a publicly traded private equity firm.[10] It is the largest stockholder in Halt and, the Plaintiffs allege, controls the Halt Board.[11] Defendant American Capital Equity I, LLC, a Delaware limited liability company and affiliate of American Capital, is a

---

[6] *Id.* at ¶¶ 21–22.
[7] *Id.*
[8] *Id.* at ¶¶ 23–43.
[9] *Id.* at ¶ 1.
[10] *Id.* at ¶ 44.
[11] *Id.*

"participant" in American Capital's investments in Halt.[12]  Defendant American

Capital Equity II, LP (collectively with American Capital and American Capital

Equity I, LLC, "ACAS")[13] is a Delaware limited partnership and affiliate of

American Capital, and is a "participant" in American Capital's investments in Halt.[14]

Collectively, ACAS held a 26 percent equity interest in Halt prior to the

Transaction.[15]

Defendants Jeffrey M. Cohen, Neil M. Hahl, Michael Janish, John L. Lewis

IV, and Gordon O'Brien (collectively, the "Director Defendants") are all current or

former Board members of Halt who the Plaintiffs assert were under the control of

ACAS.  Cohen is the Chief Executive Officer (CEO) of Halt and a current member

of the Board.[16]  Prior to the Transaction, the Halt Board voted to more than double

Cohen's compensation and to raise his secretary's salary by more than $100,000.[17]

Cohen was also allowed to continue as CEO after the Transaction and became

eligible to participate in a management incentive plan created as a part of the

Transaction, which will give him six percent of the net equity in Halt.[18]  The

---

[12] *Id.* at ¶ 45.

[13] The Complaint, at points, appears to conflate "American Capital" and "ACAS."  Subsequent quoted references to "American Capital" or "ACAS," for purposes of this Memorandum Opinion, refer to the alleged control group of American Capital, Ltd.; American Capital Equity I, LLC; and American Capital Equity II, LP.

[14] Compl. ¶ 46.

[15] *Id.* at ¶ 11(b).

[16] *Id.* at ¶ 47.

[17] *Id.* at ¶ 70.

[18] *Id.* at ¶ 71.

4

Plaintiffs concede that Cohen "has not always been a controlled director," but argue that he "became a controlled director when ACAS became empowered to decide whether Mr. Cohen would continue to receive material benefits in the form of salary and incentives."[19]

Hahl was appointed to the Halt Board by ACAS around January 2012.[20] He has also served as a member of the board of directors of American Capital since 1996.[21] Throughout his service on the Halt Board, Hahl has consistently taken positions "that favor American Capital or that are in accord with ACAS's desires."[22] In documents created by Halt related to the Transaction (the "Transaction Documents"), Hahl was identified as being "affiliated with American Capital, Ltd.," and following the Transaction, Hahl became Chairman of the Halt Board.[23]

Janish was appointed to the Halt Board by ACAS in late 2013 or early 2014 and served until September 2014.[24] Janish also served as President and Chief Executive Officer of Avalon Laboratories, an American Capital portfolio company in which ACAS "had invested" over $66 million, until September 2014.[25] While

---

[19] *Id.* at ¶ 69. *See also id.* at ¶ 108 ("While recognizing that ACAS's conduct was detrimental, Mr. Cohen supported ACAS through his votes as a director because he knew that his job as Halt's Chief Executive Officer and his income depended upon ACAS's support.").

[20] *Id.* at ¶ 48.

[21] *Id.*

[22] *Id.* at ¶ 72.

[23] *Id.* (quoting *id.* at Ex.1 (the "Transaction Documents"), at 19).

[24] *Id.* at ¶ 49.

[25] *Id.*

5

serving on the Halt Board, Janish "consistently favored positions beneficial to American Capital and voted in lockstep with other ACAS Controlled Directors."[26] Like Hahl, Janish is identified in the Transaction Documents as being "affiliated with American Capital, Ltd."[27] Janish's resignation from the Halt Board in September 2014 immediately followed ACAS's "sale of Avalon Laboratories."[28]

Lewis joined the Halt Board at American Capital's request around January 2012[29] and fills the so-called independent director seat.[30] He is also the co-founder of Gardner Lewis Asset Management, which "was among the largest" investors in ACAS.[31] Lewis is currently the second largest senior debt holder in Halt, after ACAS.[32] Lewis is also a close friend of ACAS Chairman Malon Wilkus[33] and has "consistently voted with ACAS-designated directors for positions favoring American Capital."[34] In January 2014, Calesa asked Lewis to either resign from the Halt Board or to fill an ACAS-designated seat, but Calesa "was defeated by ACAS and . . . Lewis remained on the Halt board as the 'independent director.'"[35]

Finally, O'Brien was appointed to the Halt Board by ACAS around January

---

[26] *Id.* at ¶ 75.
[27] *Id.* (quoting Transaction Documents, at 19).
[28] *Id.* at ¶ 76.
[29] *Id.* at ¶ 50.
[30] *Id.* at ¶ 77.
[31] *Id.* at ¶ 50.
[32] *Id.* at ¶ 79.
[33] *Id.* at ¶ 80.
[34] *Id.* at ¶ 81.
[35] *Id.*

2012.[36] O'Brien also serves as President, Special Finance and Operations, for ACAS and is one of seven executive officers of ACAS.[37] The Transaction Documents identify O'Brien as being "affiliated with American Capital, Ltd.,"[38] and O'Brien "routinely represent[ed] ACAS's interests in ACAS's negotiations with Halt," including in negotiations related to the Transaction.[39] The Plaintiffs allege that, upon information and belief, American Capital Chairman Malon Wilkus directed O'Brien regarding his dealings with Halt and the Halt Board.[40]

*B. Factual Overview*

### 1. ACAS Investments in Halt

On June 22, 2007, American Capital announced its first investment, along with Defendant American Capital Equity I, LLC, of $8.9 million in Halt.[41] Under the terms of this initial investment, ACAS was granted two ACAS-designated directors on Halt's five-seat Board[42] and the right to block any subsequent *pari passu* investments in Halt.[43] From that point on, the relationship between ACAS and Halt began to deteriorate. ACAS did not make any further investments in Halt over the

---

[36] *Id.* at ¶ 51.
[37] *Id.*
[38] *Id.* at ¶ 83 (quoting Transaction Documents, at 19).
[39] *Id.*
[40] *Id.* at ¶ 84.
[41] *Id.* at ¶ 59.
[42] *Id.* at ¶ 66(a).
[43] *Id.* at ¶ 62.

7

next three-and-a-half years,[44] often misleading Halt as to whether it intended to provide or extend funding.[45] Instead, certain Halt investors—including Calesa and the Plaintiff investors—established a bridge loan (the "Bridge Note") that provided all of Halt's financing during this period.[46] The Bridge Note consisted of junior debt at a 15% interest rate plus "options, warrants, and/or conversion rights."[47] Over the course of this three-and-a-half year period, the Bridge Note came due and was extended several times by the investors.[48]

In June 2011, in response to Halt's need for additional funds, ACAS offered to provide $5 million in exchange for a 50% interest in Halt.[49] The Halt Board declined the offer,[50] instead entering into a short-term loan agreement with Broadband Capital, under which Broadband Capital provided $5 million secured by Halt's intellectual property.[51] Miles Arnone, Managing Director of American Capital's Technology Group and one of ACAS's designated directors at the time, informed the Halt Board that it had made a "big mistake" in not taking American

---

[44] *Id.* at ¶ 61.
[45] *See id.* at ¶ 85; *id.* at ¶ 87 ("On several occasions, ACAS, through its designated directors, informed the Halt board either collectively or through Mr. Calesa that it would provide additional funding, only to withdraw or never formally make the offer, forcing the Halt board to negotiate under duress, which was to Halt's detriment and American Capital's benefit.").
[46] *Id.* at ¶ 61.
[47] *Id.* at ¶ 62.
[48] *Id.*
[49] *Id.* at ¶ 89.
[50] *Id.* The Plaintiffs allege that "ACAS's offer also would have severely diluted the interests of other shareholders and delayed repayment to debt holders who had been carrying Halt for much of the preceding three-and-a-half years." *Id.*
[51] *Id.* at ¶ 90.

8

Capital's offer.[52]  Four months later, Arnone informed the Halt Board that ACAS had "secretly" purchased the Broadband note and security interest in Halt's intellectual property.[53]

In the fall of 2011, again needing additional funds, the Board negotiated a potential deal with investors "Genesis" and "Novaquest" for a combined $35 million investment at a 15% interest rate, subject to ACAS's waiver of its blocking rights.[54] Instead, ACAS exercised those blocking rights, offering, as an alternative, to loan Halt an additional $20 million at a 22% interest rate, with the right to add one Board member and appoint Lewis as the "independent director."[55]  Halt accepted ACAS's offer.[56]

By the fall of 2013, Halt owed ACAS $50 million under a note due at the end

---

[52] *Id.* at ¶ 91.

[53] *Id.* at ¶ 92.

[54] *Id.* at ¶ 93.  While the Complaint does not specify that the proposed Genesis and Novaquest investment would consist of senior debt, in order for ACAS's blocking rights to apply, Genesis and Novaquest presumably sought a *pari passu i*nvestment to that of ACAS.

[55] *Id.* at ¶ 94.

[56] The Complaint omits details regarding several subsequent issuances of senior secured debt.  In January 2012, the Company sold $12.5 million in Term A Senior Secured Promissory Notes ("Term A Notes") and $8.25 million in Term B Senior Secured Promissory Notes ("Term B Notes").  *Id.* at Ex. 1, at 9 (Ex. 1, at 1–10 is hereinafter referred to as the "Information Statement").  In December 2012, the Company sold $15 million of Term C Senior Secured Convertible Promissory Notes.  The Company, in connection with this financing, also agreed to issue an additional $2,411,111.13 of Term A Notes and an additional $1,453,083.33 in Term B Notes in exchange for an extension of the maturity dates of the existing Term A Notes and Term B Notes. *Id.*

of 2013.[57]   Despite indications that ACAS would extend the note,[58] in September

2013, ACAS unexpectedly demanded repayment in full by December 31, 2013.[59]

Calesa called a Halt Board meeting to discuss different proposals for how Halt might

raise money, including a possible sale from within a Chapter 11 proceeding,

effectively prohibiting voluntary bankruptcy relief absent ACAS consent.[60]   In

October 2013, ACAS loaned Halt an additional $3 million to help it operate through

the end of 2013, in return for Halt agreeing to a supermajority vote requirement for

any future Chapter 11 proceeding.[61]  The Plaintiffs allege that a majority of the Board

approved the loan and that, at the time, ACAS had control of four of Halt's then-six

Board seats: two designated directors, Hahl and O'Brien, and two captured directors,

Lewis and Cohen.[62]   At some point "thereafter," Janish also became a member of

the Board.[63]

      Around the same time, the Board launched and conducted a sales process,

---

[57] Compl. ¶ 100.  It is not clear from the Complaint whether the $50 million note includes the $20 million loaned to Halt in March 2012.  *See infra* note 61.

[58] The Plaintiffs allege that, speaking on behalf of ACAS, O'Brien made it clear to the Board that they should not be concerned about the $50 million note and that ACAS would extend it if the need arose.  *Id.* at ¶ 101.

[59] *Id.* at ¶ 102.

[60] *Id.* at ¶ 103.

[61] *Id.* at ¶¶ 104, 106.  *See also* Information Statement, at 9 (describing the Company's sale of $3 million in Term D Senior Secured Convertible Promissory Notes).  The Plaintiffs allege that this note was an extension of the $20 million March 2012 note, Compl. ¶ 106, and that ACAS "intended the supermajority voting requirement to give ACAS the absolute authority as to whether Halt could ever file a voluntary Chapter 11 proceeding."  *Id.* at ¶ 104.

[62] *Id.* at ¶¶ 105; 66(c).

[63] *Id.* at ¶ 109.  It is unclear whether Janish joined the Board in connection with the October 2013 financing or early the following year.  *See id.* at ¶ 49.

discussing other alternative transactions with potential advisors, investors, and acquirers.[64] Most recently prior to the Transaction, in December 2013, the Board approved a proposal from Davidson Kempner Capital Management LCL for a recapitalization and debt financing, but Davison Kempner could not proceed with the transaction because, according to Davidson Kempner, its investment committee did not approve the deal.[65] Ultimately, none of these negotiations came to fruition;[66] they either could not meet Halt's working capital needs (operating expenses and payroll, for example), or were unlikely to close before the maturity dates of Halt's existing senior secured notes.[67]

### 2. The Transaction

Given Halt's failure to secure financing elsewhere, and under pressure from the impending due date of the $50 million note, Calesa, as representative of Halt, met with O'Brien, as representative of ACAS, to "negotiate a deal that would allow Halt to be sold to a third party, with Mr. Calesa leading the selling effort."[68] Cohen, along with ACAS's Robert Sacks, documented the proposed deal in the Transaction

---

[64] *Id.* at ¶¶ 95–96; Information Statement, at 10.
[65] Information Statement, at 10.
[66] Compl. ¶¶ 103, 110.
[67] Information Statement, at 10. The Complaint also omits discussion of additional notes issued in early 2014. In January 2014, the Company sold $500,000 in convertible promissory notes that were convertible into debt instruments issued in the Transaction financing. Information Statement, at 9. Additionally, in February and March 2014, the Company sold $1.2 million in additional Term A Notes. *Id.*
[68] Compl. ¶ 110.

Documents.[69]

The Transaction Documents called for a series of actions including, among others, the following. First, the Company would form Halt Merger Sub, Inc. ("Merger Sub"), a Delaware corporation,[70] and purchase 100 shares of common stock of Merger Sub.[71] Merger Sub and the Company would enter into an Agreement and Plan of Merger, pursuant to which Merger Sub would merge with and into the Company.[72] As a result of the merger, the Company's Certificate of Incorporation would be amended;[73] all issued and outstanding shares of the Company's common stock would remain outstanding and be unaffected; all issued and outstanding shares of the Company's preferred stock would be "cancelled and extinguished and delivered in exchange" pursuant to the terms of the merger agreement; and any shares of capital stock of the Merger Sub would be cancelled.[74] Additionally, the stockholders would waive any appraisal rights under the DGCL or other applicable laws,[75] and the bylaws of the Company would be amended and restated.[76]

The Company and its stockholders would also enter into a Note Purchase and

---

[69] *Id.* at ¶ 112.
[70] Information Statement, at 1.
[71] Compl. ¶ 125; Information Statement, at 1.
[72] Compl. ¶ 125; Information Statement, at 1.
[73] Compl. ¶ 125; Information Statement, at 1.
[74] Information Statement, at 2.
[75] *Id.* at 6.
[76] Compl. ¶ 125; Information Statement, at 11.

Exchange Agreement with ACAS, pursuant to which ACAS would loan the Company up to $73 million.[77] ACAS would get a blanket first priority security interest in the Company's assets and certain other rights as set forth in the Purchase Agreement and related agreements.[78] Additionally, the Transaction Documents called for the cancellation of any outstanding warrants to purchase common stock or preferred stock issued pursuant to prior agreements,[79] and the adoption of a management incentive plan, under which 12% of the proceeds of a subsequent sale of Halt, after repayment of any ACAS debt, would be divided among certain employees.[80] The management incentive plan, the Plaintiffs allege, was adopted mainly for the benefit of Jeffrey Cohen.[81] Finally, the Transaction called for changes to subordinated notes affecting the Plaintiffs, including provisions in the Transaction Documents providing that, if Halt were not sold within one year of the Transaction (by March 2015), the subordinated debt owned by minority investors would be

---

[77] Compl. ¶ 11(a). The Plaintiffs allege that, of the $73 million note, $55 million would be used to repay existing senior secured notes held by ACAS, plus accrued interest. *Id.* I note, however, that the Halt Information Statement suggests that ACAS was *not* the sole participant in the $73 million note, Information Statement at 3 ("[T]he Company [will] enter into a Note Purchase and Exchange Agreement with *certain investors* . . . , pursuant to which the [investors] will loan the Company up to approximately $73,000,000 and the Company will issue to the Lenders senior secured promissory notes . . . and shares of its Series AA Preferred Stock, Series BB Preferred Stock, and Common Stock.") (emphasis added), and that the Complaint elsewhere indicates that investors other than ACAS participated, Compl. ¶ 11(b) ("Following the Merger, the holders of the $73 million note, *primarily ACAS*, held approximately 66% of the equity in Halt.") (emphasis added).

[78] Information Statement, at 3.

[79] Compl. ¶¶ 11(e), 127.

[80] *Id.* at ¶ 11(c).

[81] *Id.* at ¶ 11(c).

13

converted to equity,[82] and the Series BB preferred stock owned by minority investors would be cancelled.[83]

### 3. The Transaction Documents

The Plaintiffs received copies of the Transaction Documents on March 11, 2014 via e-mail with instructions to sign and return them by the end of the following day.[84] The 297-page set of Transaction Documents consists of an "Information Statement," 14 other agreements, and various attachments.[85] The Information Statement provides an overview of the Transaction's structure and key terms. The Plaintiffs allege that the terms recorded in these Transaction Documents are significantly different from the deal negotiated by Calesa and O'Brien, to the benefit of ACAS,[86] and that of these documents, several were "incomplete, in draft form, or were missing entirely."[87]

---

[82] *Id.* at ¶ 11(d).

[83] *Id.* at ¶ 11(f).

[84] *Id.* at ¶ 114.

[85] *Id.* at ¶ 124. The Transaction Documents include the Information Statement; Stockholder Consent; Certificate of Incorporation of Merger Sub; Agreement and Plan of Merger by and Among Halt Medical, Inc. and Halt Merger Sub, Inc.; Certificate of Merger; Amended and Restated Certificate of Incorporation of Halt Medical, Inc.; Second Amended and Restated Bylaws of Halt Medical, Inc.; Note Purchase and Exchange Agreement; Form of Note; Security Agreement; IP Security Agreement; Voting Agreement; IRA Termination Agreement; Co-Sale Agreement; 2011 Amended and Restated Certificate of Incorporation; two 2012 Amendments to the Amended and Restated Certificate of Incorporation; 2013 Amendment to the Amended and Restated Certificate of Incorporation; a copy of 8 *Del. C.* § 262; unaudited financials for Halt; Subordination and Amendment Agreement; Second Amended and Restated Investor Rights Agreement; and the Halt Medical Capitalization Table. *Id.* at ¶ 130.

[86] *Id.* at ¶ 113.

[87] *Id.* at ¶ 15. The allegedly missing terms were not detailed in the Complaint, but the Plaintiffs clarified during oral argument that the Transaction Documents excluded a provision providing for

14

Additionally, the Plaintiffs allege that "[t]he pressure to close the . . . Transaction within one day was manufactured by American Capital in order to force the [Plaintiffs] to sign"[88] and that they were "coerced into the . . . Transaction through ACAS's Controlled Directors' pressure and inequitable conduct, including false representations by ACAS representatives that Halt would be sold within one year, which would have given the [Plaintiffs] an opportunity to recover some of their investments, despite the significantly dilutive impact of the [Transaction] on the [Plaintiffs'] interests."[89] The Plaintiffs only signed, they allege, "under a threat that if they did not sign, American Capital would demand payment in full of its $50 Million Note, which Halt could not pay, and could no longer prevent through a Chapter 11 proceeding."[90]

Upon information and belief, the Plaintiffs allege that the Board—which at the time consisted of Hahl, Janish, O'Brien, Lewis, Cohen, Calesa, and Lee[91]—also received and signed the Transaction Documents within one day.[92] The Plaintiffs allege that, due to this tight timeframe, the Transaction was approved by Halt's

---

the sale of Halt within one year. Oral Argument Tr. 62:21–24 ("THE COURT: So what's the material term that was missing? Is it this agreement to sell the company in a year? MR. BIEMER: Yes, Your Honor.").

[88] Compl. ¶ 15.
[89] *Id.* at ¶ 13.
[90] *Id.* at ¶ 115.
[91] *Id.* at ¶¶ 66–67.
[92] *Id.* at ¶ 14.

15

Board with "little or no analysis as to its fairness" to the Plaintiffs.[93] Specifically, the Board approved the Transaction without an independent valuation of the Transaction or the benefits ACAS was to receive in exchange for its additional financing; a fairness opinion or the assistance of a financial advisor; a special committee of independent directors to review the Transaction; an opportunity to solicit or explore financing from other sources under less "onerous" terms; having read the Transaction Documents; or holding a meeting of the Board to vote on the Transaction Documents.[94]

### 4. The Board's Failure to Sell Halt Post-Transaction

Following the Transaction, ACAS's position in Halt increased from approximately 26% to almost 66%,[95] and ACAS had four ACAS-designated seats out of a total of seven, held by Hahl, Janish, O'Brien, and non-party Sacks,[96] who

---

[93] *Id.* at ¶ 8. *But see infra*, note 94.

[94] Compl. ¶¶ 9, 119–23. I note, however, that the Information Statement provides that the Board "determined that the Merger . . . represented the most attractive transaction for Halt and its stockholders taking into account the terms of the proposal, the level of commitment on the part of the potential investors and the likelihood that the transaction would close so that Halt could continue its business." Information Statement, at 10. The Board noted specifically that "the proposed transactions provided for the simplification of the Company's capital structure making the Company more attractive to prospective investors, provided for the conversion of the Senior Secured Notes and Bridge Notes, and provided the Company with additional equity financing to meet[] its near term working capital needs." *Id.*

[95] Compl. ¶ 11(b). As pled, ACAS's post-Transaction equity position is not entirely clear. The Complaint alleges that, "[f]ollowing the Merger, the holders of the $73 million note, *primarily ACAS*, held approximately 66% of the equity in Halt," but does not state what percentage of the equity of Halt that ACAS, alone, held. *Id.* (emphasis added).

[96] *Id.* at ¶ 66(d).

16

replaced former director Lee.[97]  The Plaintiffs allege that ACAS received a disproportionate benefit from the Transaction, representing an unfair price to Plaintiffs in light of the substantial contributions made by the minority investors to help keep Halt afloat during the preceding years.[98]  They allege that only after the Transaction did the Defendants' true motive emerge:[99] ACAS sought to starve Halt, ensuring the dilution of the Plaintiffs' interests and the cancellation of their Series BB Preferred stock, all in order to "squeeze" the minority investors out of the Company.[100]  According to the Plaintiffs, ACAS—ignoring the fact that Halt was "well-positioned for a sale" prior to the Transaction[101]—had no intention to sell Halt, seeking instead to seize the value of the Company for itself.[102]

---

[97] *Id.* at ¶ 68.

[98] *See id.* at ¶ 138 ("American Capital received a disproportionate benefit from the [] Transaction in the form of almost all of Halt's value in comparison to the money that ACAS might advance to Halt as part of the Transaction.  On the other hand, the [Plaintiffs], whose Bridge Note and equity investments provided significant support to Halt for many years, have seen their interests severely diluted and will suffer further dilution in March 2015.  The [] Transaction therefore was entirely unfair in terms of price.").

[99] *Id.* at ¶ 16 ("The true facts only emerged post-Merger.  Since March 2014, it has been made clear that the purpose of the . . . Transaction was not to fund Halt, which has seen little benefit from the [Transaction], but to squeeze out the minority investors and leave ACAS with everything.").

[100] *See id.* at ¶ 133 ("American Capital instead has demonstrated an intent to (a) starve Halt by cutting Halt's budget to the bone; (b) prevent Halt from commercializing the Acessa™ System; (c) block any possibility of a sale or full blown commercialization until at least 2016, thereby making certain that the Minority Investors have no opportunity to prevent the further dilution and subordination of their interests and the cancellation of the Series BB Preferred stock; and (d) position Halt to miss its covenants in 2014, which will allow American Capital to take over").

[101] *See, e.g.*, *id.* at ¶ 98 ("In 2013, the Center for Medicare and Medicaid Service ("CMS") announced it would cover the Acessa™ procedure at the highest reimbursement amount offered for any gynecological procedure.").

[102] *Id.* at ¶ 18 ("American Capital and the Controlled Directors announced that there is no interest in selling Halt, and that they will do little in respect to commercializing and marketing the

17

## C. Procedural History

The Plaintiffs filed their Verified Complaint on January 16, 2015 as a direct action against ACAS and the Director Defendants. Count I, against ACAS, alleges breach of fiduciary duty, owed as a controlling stockholder, to minority investors.[103] Count II, against the Director Defendants, alleges breach of fiduciary duty by approving the Transaction with terms dictated by ACAS and without adequate review, and by attempting to conceal and avoid disclosure of the relevant details of the Transaction by providing the Transaction Documents one day before they had to be signed and returned.[104] Count III, pled in the alternative against ACAS, alleges aiding and abetting breaches of fiduciary duty owed by the Director Defendants.[105] Finally, Count IV, against the Director Defendants, alleges violations of Sections 242(b)(1) and 228 of the DGCL.[106] The Plaintiffs seek a judgment rescinding the Transaction and restoring the rights and investment interests of the Plaintiffs, damages, a judgment enjoining further violations of the Defendants' fiduciary duties, and costs of the action.[107]

---

Accessa™ System until after 2015, thereby furthering their scheme to seize the value of Halt for ACAS, to the detriment of Halt's" minority investors, the Plaintiffs here.).

[103] *Id.* at ¶ 142. The Plaintiffs contend that ACAS, the purported controller of Halt, concocted a scheme to substantially reduce the Plaintiffs' interests in Halt and to take control of its valuable intellectual property without fair price or process. *Id.* at ¶ 2.

[104] *Id.* at ¶¶ 157–58.

[105] *Id.* at ¶¶ 162–73.

[106] *Id.* at ¶¶ 174–82.

[107] *Id.* at 47.

The Defendants filed a Motion to Dismiss on February 10, 2015 (the "Motion"). After full briefing of the Motion, I heard oral argument on September 16, 2015, at which time I requested supplemental briefing relating to the acquiescence and estoppel defenses raised by the Defendants.[108] This Memorandum Opinion denies in part and grants in part the Defendants' Motion.

## II. ANALYSIS

### A. Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all well-pled allegations of fact and draw reasonable inferences in the plaintiff's favor."[109] The Court will dismiss the complaint "only if it determines with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to relief."[110] However, the Court need not accept "[m]ere conclusions of law or fact."[111]

The Plaintiffs have made no attempt to argue that demand on the current Board should be excused here, and presumably in light of the restriction of the

---

[108] Specifically, I asked the parties to address whether "the actions and knowledge of Mr. Calesa [can] be imputed to Plaintiffs, Calesa Associates, L.P. and Calesa Family Trust, July 6, 2000, upon the record appropriate to consideration of the Motion to Dismiss?" *Calesa Assoc., L.P. v. Am. Capital, Ltd.*, C.A. 10557-VCG, at 1 (Del. Ch. Oct. 15, 2015) (LETTER).

[109] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014) (citation omitted).

[110] *Berger v. Intelident Solutions, Inc.*, 911 A.2d 1164, 1168–69 (Del. Ch. 2006) (internal quotation omitted).

[111] *Id.* at 1169 (citation omitted).

Complaint to extraction-type *Gentile*[112] direct claims, the Defendants have moved under Rule 12(b)(6), and have argued for dismissal under the lenient notice standard set out above. A few observations are in order, however.

Claims alleging dilution resulting from a breach of the duty of loyalty benefiting an insider were recognized as both derivative and direct in *Gentile v. Rossette* and *Carsanaro*. These decisions were in the post-merger context: the derivative claims there were extinguished by the merger and, absent direct actions, the breaches of loyalty alleged could never be remedied, an anathema to equity. Here, by contrast, the fiduciary duty claims alleged—similarly dual in nature as were those in *Gentile* and *Carsanaro*—could be pursued derivatively by the Plaintiffs, who remain stockholders in Halt. That, however, would require a specific pleading sufficient to show that demand, with reference to the current Board, would be futile. In other words, the dual nature of the extraction claim in this context allows a plaintiff to choose a form of action with either a lenient or a strict pleading standard. The result is not hard to predict.

Such a situation is problematic. The negative aspects of derivative litigation—including diversion of the board's attention from the company's business, as well as the possibility of strike suits—gave rise to the pleading requirements of Rule 23.1. The same negatives apply to the direct extraction claim.

---

[112] *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006).

20

This pleading anomaly and its potential for mischief was noted by the Court in the recent *In re El Paso Pipeline Partners, L.P. Derivative Litigation*.[113] In that case, a cause of action that was in fact both direct and derivative was brought as a derivative claim only. A merger subsumed the derivative claim. In addition to finding that the cause of action survived the merger, the *El Paso* Court opined that

> [t]he more appropriate way to view [such a] cause of action . . . is as a dual-natured claim with aspects that are both derivative and direct. In my view, Delaware law can and should treat a dual-natured claim as derivative for purposes of Rule 23.1 and the doctrine of demand, but as direct for purposes of determining whether sell-side investors can continue to pursue the claim after a merger.[114]

In other words, *El Paso* suggests that a dual-natured claim should be addressed under the particularized pleading standard of Rule 23.1.

If this rationale—which, to my mind, is self-evidently reasonable and efficient—were applied here, it would require a pleading that the Plaintiffs have not attempted to make, and a review under a particularized pleading standard that neither party has argued is appropriate.[115] Therefore, I analyze the Complaint under the pleading requirements of Rule 12(b)(6).

*B. Counts I and II: Breaches of Fiduciary Duties by ACAS and the Director Defendants*

---

[113] 2015 WL 7758609 (Del. Ch. Dec. 2, 2015).
[114] *Id.* at *2.
[115] The Defendants have argued that the Plaintiffs' claims are derivative, not direct; they have not argued that to the extent direct claims were pled, they were nonetheless subject to Rule 23.1.

21

The "reasonable conceivability" pleading standard of Rule 12(b)(6) "asks whether the allegations in the complaint could entitle a plaintiff to relief," which in turn "depends upon the level of scrutiny under which those allegations are reviewed."[116] The business judgment rule establishes a presumption in favor of the directors,[117] which a plaintiff can overcome by adequately alleging facts to support a reasonable inference that "(1) a controlling stockholder stands on both sides of a transaction or (2) at least half of the directors who approved the transaction were not disinterested or independent."[118] Where the business judgment rule is rebutted, entire fairness is the applicable standard of review.[119] Under the entire fairness standard, the Court will inquire "into two interrelated concepts: fair dealing and fair price."[120] Because I find below that the Plaintiffs have pled facts supporting a

---

[116] *Crimson Exploration*, 2014 WL 5449419, at *8.

[117] *See id.* at *9 ("Under 8 *Del. C.* § 141(a), the business and affairs of a corporation are managed under the direction of the board of directors. The business judgment rule is a principle of prudence and discretion that operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation. The rule in effect provides that where a director is independent and disinterested, there can be no liability for corporate loss, unless the facts are such that no person could possibly authorize such a transaction if he or she were attempting in good faith to meet their duty. The rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be attributed to any rational business purpose.") (internal quotations omitted).

[118] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 990 (Del. Ch. 2014) (citations omitted).

[119] *E.g.*, *New Jersey Carpenters Pension Fund v. info GROUP, Inc.*, 2011 WL 4825888, at *8 (Del. Ch. Sept. 30, 2011).

[120] *Crimson Exploration*, 2014 WL 5449419, at *9. *See also id.* ("[Fair dealing] embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained. The [fair price] aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any

22

reasonable inference that ACAS was a controlling stockholder standing on both sides of the Transaction, entire fairness review is triggered.[121]

A stockholder is controlling, and owes fiduciary duties to the other stockholders, "if it owns a majority interest in or *exercises control* over the business affairs of the corporation."[122] Here, because ACAS owned only 26% of the Company prior to the Transaction, the Plaintiffs must allege facts to demonstrate that ACAS exercised "actual control" over the Board at the time of the Transaction. The Plaintiffs allege in Count I that ACAS breached its fiduciary duties owed as a controlling stockholder to the minority Plaintiff investors by "exercise[ing] control over Halt's business and affairs,"[123] and by "promoting its own interests over the interests" of the Plaintiffs.[124] They allege further that "American Capital on its own and through [the Director Defendants] on the Halt Board has repeatedly manipulated Halt by promising, then withholding, funding, and acquiring the Broadband note secured by Halt's intellectual property in order to force the Halt board to make

---

other elements that affect the intrinsic or inherent value of a company's stock." (quoting *Emerald Partners v. Berlin*, 787 A.2d 85, 97 (Del. 2001))).

[121] *Orman v. Cullman*, 794 A.2d 5, 21 (Del. Ch. 2002) ("One way for a plaintiff to overcome [the] burden [of the business judgment rule], for example, is to allege facts demonstrating a squeeze out merger or a merger between two corporations under the control of a controlling shareholder. If facts of that nature are sufficiently alleged, the business judgment presumption is rebutted and entire fairness is the standard of review.").

[122] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (emphasis in original).

[123] Compl. ¶ 144.

[124] *Id.* at ¶ 145.

23

decisions under duress that were to the detriment" of the Plaintiffs.[125]   The

Defendants counter that the "Plaintiffs' theory appears to be that the contractual

rights held by ACAS allegedly gave it superior bargaining position with respect to

the Transaction and, therefore, ACAS had the ability to control the Halt Board by

virtue of that bargaining position,"[126] contending that "[n]o other theory is pled."[127]

They argue that, because a plaintiff cannot demonstrate control by merely alleging

facts demonstrating that a stockholder has exercised duly obtained *contractual* rights

to its benefit and to the detriment of the company,[128] I should dismiss Count I for

failure to state a claim.

While I agree with the Defendants that the Plaintiffs' allegations regarding

ACAS's exercise of contractual rights, alone, are not sufficient to demonstrate

control,[129] that is not the only theory on which the Plaintiffs have relied in claiming

---

[125] *Id.* at ¶ 146.
[126] Defs' Opening Br. 25.
[127] *Id.*
[128] *See, e.g.*, *Thermopylae Capital Partners v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) ("[A] stockholder who—via majority stock ownership or through control of the board—operates the decision-making machinery of the corporation, is a classic fiduciary; in controlling the company he controls the property of others—he controls the property of the non-controlling stockholders. Conversely, an individual who owns a contractual right, and who exploits that right—even in a way that forces a reaction by a corporation—is simply exercising his own property rights, not that of others, and is no fiduciary."); *Superior Vision Serv., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006).
[129] For instance, the Plaintiffs' following allegation, alone, would be insufficient to demonstrate control by ACAS:

> ACAS . . . has used its blocking rights (a) to force the Halt board to accept funding on increasingly egregious terms, including an above-market interest rate, exorbitant fees, additional equity, and additional seats on the Halt board; (b) to prevent Halt from financing with other institutional investors on a *pari passu* basis from ACAS;

that ACAS exercised control over the Halt "corporate machinery";[130] the Plaintiffs have pled sufficient facts to demonstrate that a majority of the Board was under the actual control and influence of ACAS.[131]

In *In re Crimson Exploration Inc. Stockholders Litigation*,[132] after conducting a survey of nine cases considering controller status for a minority stockholder, then-Vice Chancellor Parsons found no correlation between the percentage of equity owned and the determination of control status, holding that "[t]hese cases show that a large blockholder will not be considered a controlling stockholder unless [it] actually control[s] the board's decision about the challenged transaction."[133] In conducting this survey, the Vice Chancellor determined that there is no magic formula to find control; rather, it is a highly fact specific inquiry.[134] For example, in

---

and (c) to preclude certain [Plaintiffs] from participating on a *pari passu* [sic] even when the terms were better than those offered by ACAS.
Compl. ¶ 63.

[130] *See Harman v. Masoneilan Int'l., Inc.*, 442 A.2d 487, 499 (Del. 1982).

[131] The facts before me here differ from those in *ReliaStar* and *Thermopylae*, where the plaintiffs did not allege facts sufficient to demonstrate that a majority of the board was under the control of the purported controller. In *ReliaStar*, any issuance of dividends by the company's board of directors was subject to a limitation in a series of stock purchase agreements requiring the "written consent of at least two-thirds of the [securities] then owned by such [i]nvestors." ReliaStar—a 44% equity-holder—thus wielded the contractual power to unilaterally block any issuance of dividends approved by the company's board. The action, alleging a breach of fiduciary duties by ReliaStar through its refusal to provide written consent to a dividend issuance unanimously approved by the board, was ultimately dismissed on the grounds that the exercise of a duly obtained contractual right does not amount to control. Similarly, the complaint in *Thermopylae* was dismissed, in part, because the allegation that the purported controller exercised its duly obtained contractual rights to the detriment of the Company, alone, was insufficient to demonstrate control.

[132] 2014 WL 5449419 (Del. Ch. Oct. 24, 2014).

[133] *Crimson Exploration*, 2014 WL 5449419, at *10.

[134] *Id.* ("[T]he scatter-plot nature of the holdings highlights the importance and fact-intensive nature of the actual control factor.").

one of the examined cases, *New Jersey Carpenters Pension Fund v. info GROUP, Inc.*,[135] the Court "denied the defendants' motion to dismiss merger-related duty of loyalty claims on the grounds that the complaint adequately alleged that a majority of the directors lacked independence from Gupta, a director and the alleged controller, who the court found was interested in the transaction because of a unique liquidity need."[136]  Similarly, I find here that the Plaintiffs' factual allegations are sufficient, under the low "reasonable conceivability" standard of Rule 12(b)(6), to infer that a majority of the Board was not independent or disinterested, but rather was under the influence of, or shared a special interest with, ACAS in regard to the Transaction, such that ACAS was a controlling stockholder at the time of the Transaction.  This determination, in turn, is sufficient to rebut the business judgment rule with respect to actions of the Board.

Directors are "self-interested" when they appear on "both sides of a transaction" or expect to "derive any [material] personal financial benefit from it in the sense of self-dealing."[137]  They lack independence where they were "'beholden' to . . . or so under [the controller's] influence that their discretion would be sterilized."[138]  The Plaintiffs allege that, at the time of the Transaction, five of the

---

[135] 2013 WL 610143 (Del. Ch. Feb. 13, 2013).
[136] *Crimson Exploration*, 2014 WL 5449419, at *11.
[137] *Orman*, 794 A.2d at 23 (internal quotation marks omitted).
[138] *Id.* at 24 (alteration in original).

Halt Directors were under the "control and influence of ACAS": Cohen, Hahl, Janish, Lewis, and O'Brien.[139] However, because there were seven directors on the Board at the time of the Transaction,[140] I need only make such a determination with respect to four of the Director Defendants in order to deny the Motion.

ACAS appointed several of the Director Defendant to the Board of Halt. The Defendants correctly argue that "[t]he fact that an allegedly controlling stockholder appointed its associates to the board of directors . . . without more, does not establish actual domination."[141] Whether these Defendants were controlled is an issue of fact which must, at this stage, be determined from an examination of the well-pled facts in the Complaint. I turn first to the allegations surrounding Director Defendants O'Brien and Hahl. "[F]or purposes of this Motion," the Defendants do not contest that O'Brien—who negotiated the Transaction on ACAS's behalf—lacked independence.[142] With respect to Hahl, the Plaintiffs allege that he, in addition to serving on Halt's Board, also served on the board of American Capital starting in 1996.[143] Hahl is thus a classic dual fiduciary, with duties to both sides in the

---

[139] Compl. ¶ 7.
[140] *Id.* at ¶ 67.
[141] *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 258 (Del. Ch. 2006) (citation omitted).
[142] *See* Defs' Opening Br. 35 ("The Complaint does not articulate a theory by which Mr. O'Brien is interested in the Transaction. However, the Complaint alleges that Mr. O'Brien is an officer of ACAS, who acted as the primary negotiator for ACAS in the Transaction. Although Defendants do not concede that Mr. O'Brien lacked independence from ACAS, they do not contest that issue for purposes of this Motion.").
[143] Compl. ¶ 48.

Transaction.[144]

I next turn to Director Defendant Janish. The Plaintiffs allege that at the time of the Board action on the Transaction, Janish served as President and Chief Executive Officer of Avalon Laboratories, an American Capital portfolio company in which ACAS "had invested" over $66 million.[145] The Defendants argue that this is insufficient; they point out that the Complaint does not establish that Janish's position at Avalon Laboratories was in any way under the control of ACAS, or that any compensation from Avalon Laboratories was material to him.[146] For purposes of this Motion, I need not resolve this issue, because Halt's Information Statement itself provides the following disclosure regarding Janish, as well as O'Brien and Hahl:

> In considering whether to approve the Merger, Halt Stockholders should be aware that certain members of the Board of Directors have *interests that are in addition to or different than the interests of Halt's Stockholders generally*.
> The following directors are affiliated with parties that have indicated their intention to participate in the Financing: Gordon O'Brien (by virtue of his association with American Capital, Ltd. and/or its affiliates), Neil Hahl (American Capital, Ltd. and/or its affiliates), and Mike Janish (American Capital, Ltd. and/or its affiliates).[147]

It is well-settled that a director "is considered interested when he will receive a

---

[144] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).
[145] Compl. ¶ 74.
[146] Defs' Opening Br. 31–32.
[147] Information Statement, at 8 (emphasis added).

28

personal financial benefit *from a transaction* that is not equally shared by the stockholders."[148]  Therefore, I find that this disclosure in the Information Statement, along with the other factual allegations described above, is sufficient for Plaintiffs to satisfy the low "reasonable conceivability" standard of pleading under a 12(b)(6) motion with respect to these Director Defendants, including Janish.

I turn next to the allegations surrounding Cohen, the Halt CEO.  The Plaintiffs suggest that Cohen was subject to a classic Morton's Fork:[149] approve the transaction despite what the Plaintiffs allege is the detriment to the unaffiliated stockholders, or see the Company—the source of his income—driven into ruin.  Thus, in the Plaintiffs' view, Cohen was unable to exercise his independent business judgement on behalf of the Company.  Specifically, the Plaintiffs allege that Cohen became beholden to ACAS when ACAS "became empowered to decide whether Mr. Cohen would continue to receive material benefits in the form of salary and incentives,"[150] and that Cohen, "[w]hile recognizing that ACAS's conduct was detrimental, . . . supported ACAS through his votes as a director because he knew that his job as Halt's Chief Executive Officer and his income depended upon ACAS's support."[151]  I find that these factual allegations are sufficient to

---

[148] *Orman*, 794 A.2d at 29 (emphasis in original) (citation omitted).
[149] Not to be confused with the less-problematic Morton's Toe.
[150] Compl. ¶ 69.
[151] *Id.* at ¶ 108.

demonstrate that Cohen was not independent from ACAS. Given that Cohen faced a decision between supporting the Transaction, on terms highly favorable to ACAS, and rejecting the Transaction, which was tantamount (on the facts alleged) to voting for the collapse of the Company and losing his employment, it is reasonably conceivable that Cohen was "beholden" to ACAS.[152]

I therefore find that the Plaintiffs have pled sufficient facts to support a reasonable inference that a majority of the Board was not disinterested or lacked independence from ACAS,[153] such that ACAS was a controlling stockholder at the time of the Transaction. Accordingly, the Defendants' Motion is denied with respect to Count I.[154] Count II alleges that the Director Defendant acted in pursuit of self-interest in breach of the duty of loyalty. For the reasons stated above, explaining that the Complaint has sufficiently pled that ACAS controlled the Board, it has similarly sufficiently pled that the majority of the directors were interested in this transaction, and the Motion is denied with respect to Count II as well.

### C. Count III: Aiding and Abetting a Breach of Fiduciary Duty

Count III asserts a claim against ACAS for aiding and abetting the Director

---

[152] *Carsanaro*, 65 A.3d at 639 (citing *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993); *Orman*, 794 A.2d at 25 n.50).

[153] Because I have already determined that sufficient allegations of lack of independence or disinterestedness were made with respect to four of the seven Directors, I need not address the allegations surrounding Director Defendant Lewis.

[154] *See Orman*, 794 A.2d at 20 n.36 (holding that, once triggered, entire fairness "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.").

Defendants' breaches of fiduciary duty. To state a claim for aiding and abetting, a plaintiff must allege "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."[155]

Should I ultimately determine that ACAS was a controlling stockholder at the time of the Transaction, then this claim will fail for lack of a "defendant, who is not a fiduciary," participating in the breach. However, if I ultimately find that ACAS was not a controlling stockholder, but that a majority of the Board nonetheless lacked independence or was not disinterested, it is conceivable that ACAS was a non-fiduciary aider and abettor of the disloyal Board; thus, the Complaint states a justiciable claim.[156] Of course, this is an alternative pleading, and the Plaintiffs must recover under one theory or the other. That can await a developed record. Accordingly, I reserve this determination for a later stage of the proceedings, and the Defendants' Motion with respect to Count III is denied.

---

[155] *Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *18 (Del. Ch. Dec. 20, 2012).

[156] *Carsanaro*, 65 A.3d at 658 ("In my view, the Delaware Supreme Court's decisions preserve stockholder standing to pursue individual challenges to self-interested stock issuances when the facts alleged support an actionable claim for breach of the duty of loyalty. Standing will exist if a controlling stockholder stood on both sides of the transaction. Standing will also exist if the board that effectuated the transaction lacked a disinterested and independent majority. Standing will not exist if there is no reason to infer disloyal expropriation, such as when stock is issued to an unaffiliated third party, as part of an employee compensation plan, or when a majority of disinterested and independent directors approves the terms.").

*D. Count IV: Violation of DGCL Sections 242(b)(1) and 242*

Count IV asserts a violation of DGCL Sections 242(b)(1)[157] and 228[158] against the Director Defendants. Specifically, the Plaintiffs allege that "[b]y giving the [Plaintiffs] only one day to review the 297-page [Transaction] Documents and demanding that they execute the stockholder consent and other agreements related to the [Transaction] under duress, the [Directors Defendants] violated the *purpose* of the Delaware law, which is to make certain that shareholders make informed judgments."[159] Additionally, the Plaintiffs allege that "several of the [Transaction] Documents that [the Plaintiffs] were asked to sign were incomplete, had missing attachments, or were in draft form."[160] In reply, the Defendants argue that neither section sets a minimum time for considering and executing a written consent[161] and that, "[a]t best, Plaintiffs' allegations suggest some sort of breach of fiduciary duty

---

[157] Under Section 242(b)(1), when an amendment to a certificate of incorporation effects a change in stock or stockholder rights, the board of directors "shall adopt a resolution setting forth the amendment proposed, declaring its advisability, *and either calling a special meeting of the stockholders* entitled to vote in respect thereof for the consideration of such amendment *or directing that the amendment proposed be considered at the next annual meeting of the stockholders*." 8 *Del. C.* § 242(b)(1) (emphasis added).

[158] Section 228 provides, in part, that "[u]nless otherwise provided in the certificate of incorporation," the stockholders may act "*without a meeting*, without prior notice and without a vote, *if a consent or consents in writing*" are "signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted . . . ." 8 *Del. C.* § 228(a) (emphasis added).

[159] Compl. ¶ 178 (emphasis added).

[160] *Id.* at ¶ 179.

[161] Defs' Reply Br. 29.

regarding disclosure."[162]

The Plaintiffs fail to state a claim with respect to Section 242. The Plaintiffs allege that they were given the directive to "review, execute, and return the stockholder consent and other agreements within one day,"[163] and that this quick timeframe forced them to "act without a complete understanding of what was contained in the documents or what changes the Halt board intended with respect to Halt ownership,"[164] which constituted a failure to "strictly comply with Delaware law in form or substance."[165] The Plaintiffs do not specifically tie any of these allegations to Section 242(b)(1). As I understand this argument, it is that the time for consideration of the action by consent must be as full as would be the case where the action was considered at a Section 242 meeting. However, as a threshold matter, I find that Section 242 is not relevant to the facts at hand; the Board availed itself of the *exception* to the general rule set forth in Section 242(b)(1)—Section 228—in obtaining stockholder approval by written consent. If that section was complied with, the statutory scheme is satisfied.

However, the Plaintiffs do allege sufficient facts to state a claim under Section

---

[162] *Id.* at 30. The Defendants continue to argue that, even if such a disclosure claim were made in the Complaint, it would nonetheless fail, because the Plaintiffs have failed to allege "that the purported disclosure deficiencies were *material* to their decision to vote in favor of the transaction." *Id.* (emphasis in original).
[163] Compl. ¶ 180.
[164] *Id.*
[165] *Id.* at ¶ 181.

33

228. They allege that "several of the [Transaction] Documents that [the Plaintiffs] were asked to sign were incomplete, had missing attachments, or were in draft form."[166] Parts of the Transaction Documents, the 297-page series of documents sent to the Plaintiffs for review, were named as exhibits to the stockholder written consent. I agree with this Court's reasoning in *Carsanaro*, pointing out that, "[b]ecause Section 228 permits immediate action without prior notice to minority stockholders," actions under Section 228 require strict compliance to avoid mischief and disorder in corporate actions.[167] The *Carsanaro* Court held that, "[w]hen a consent specifically refers to exhibits and incorporates their terms, the plain language of Section 228(a) requires that a stockholder have the exhibits to execute a valid consent."[168] Though *Carsanaro* involved more clear-cut facts—in that several of the referenced exhibits were missing in their entirety—the Plaintiffs' allegation here that several of the exhibits were in draft form or were missing attachments is nonetheless sufficient to state a claim at this stage of the proceedings.[169]

### E. Acquiescence, Estoppel, and Laches

---

[166] *Id.* at ¶ 179.

[167] *Carsanaro*, 65 A.3d at 641 (quoting *Empire of Carolina, Inc. v. Deltona Corp.*, 501 A.2d 1252, 1255–56 (Del. Ch. 1985), *aff'd*, 505 A.2d 452 (Del. 1985)).

[168] *Carsanaro*, 65 A.3d at 641.

[169] Because I find sufficient the Plaintiffs' allegations regarding incomplete documents attached as exhibits to the stockholder written consent, I do not reach the Plaintiffs' allegations that the stockholder written consents were signed under duress.

The Defendants urge me to, in the alternative, dismiss the Complaint under the doctrines of acquiescence, estoppel, and laches. They argue that the factual allegations of the Complaint make clear that the Plaintiffs "acquiesced in the transaction and cannot now attack it," and that the Plaintiffs unreasonably delayed in raising their challenges to the Transaction by waiting ten months to file their Complaint.[170] The Plaintiffs, in turn, contend that the Defendants' acquiescence and estoppel defenses must fail for two reasons: first, the Defendants rely upon authority that does not apply in transactions governed by entire fairness; and second, the Defendants ignore case law applying to situations, such as the Plaintiffs allege is the case here, where the plaintiffs lacked informed consent or acted under duress.[171] With respect to the laches defense, the Plaintiffs argue that a ten-month delay was not unreasonable given their need to carefully examine the Transaction Documents, secure representation, and draft the Complaint.[172]

Whether or not the acquiescence and estoppel defenses apply is a highly fact-specific inquiry, and one that I cannot conduct on the record before me now. The Defendants, for instance, urge me to impute the actions of Halt's co-founder and former Director, Calesa, to the Calesa Entities that are named Plaintiffs in this action.

---

[170] Defs' Opening Br. 12 (quoting *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 848 (Del. 1987)).

[171] Pls' Answering Br. 40.

[172] *Id.* at 47.

They argue that because Calesa negotiated the Transaction, urged the Plaintiffs to vote for it, and then did personally vote for it, he—and the entities on behalf of which he signed—should be barred from now challenging the Transaction. After reviewing the Complaint and the supplemental briefing with respect to this issue, however, I do not find that the record is sufficient, at this stage of the proceedings, to impute the actions of Calesa to the Calesa Entities. Moreover, even if the acquiescence and estoppel doctrines could apply to the facts of this case, which assumption I note the parties vigorously debate,[173] the application of these defenses would not bar every named Plaintiff from pursuing this action. Of the 23 named Plaintiffs, the Defendants have identified only 17 that executed written stockholder consents to the Transaction.[174] Given this fact—that the application of these defenses would not require dismissal of the entire Complaint—it makes little sense from the perspective of judicial economy to address these arguments now, without the aid of a developed record. Similarly, I consider the fact-intensive laches analysis—in light of the fact that that the analogous statute of limitations had not run at the filing of the

---

[173] The Plaintiffs have vigorously argued that the doctrines of estoppel and acquiescence cannot be applied to transactions warranting entire fairness review, in light of this Court's opinions in *Gesoff v. IIC Industries, Inc.*, 902 A.2d 1130 (Del. Ch. 2006); *In re JCC Holding Co., Inc.*, 843 A.2d 713 (Del. Ch. 2003); and *In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057 (Del. Ch. 2001). *See* Oral Arg. Tr. 63:16–64:9. Conversely, the Defendants have pointed to the opinions in *Bershad*, 535 A.2d 840, and *Kahn v. Household Acquisition Corp.*, 591 A.2d 166 (Del. 1991), to demonstrate that, historically, the Delaware Supreme Court has allowed the application of these doctrines in cases triggering entire fairness review. *See* Oral Arg. Tr. 21:10–22:1.
[174] *See* Pls' Answering Br. 45 n.13.

Complaint—to be better deferred to a time when the record is more developed.

## III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is granted with respect to the portion of Count IV alleging non-compliance with DGCL Section 242(b)(1), and is otherwise denied. The parties should supply an appropriate form of order.